**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**CHRISTAL MARTIN,**

      **Plaintiff,**

                         **Civil Action 2:15-cv-2938**
                         **Chief Magistrate Judge Elizabeth P. Deavers**

  **v.**

**COMMISSIONER OF SOCIAL SECURITY,**

      **Defendant.**

## OPINION AND ORDER

Plaintiff, Christal Martin, brings this action under 42 U.S.C. §§ 405(g) and 1383(c)(3) for review of a final decision of the Commissioner of Social Security ("Commissioner") denying her applications for social security disability insurance benefits and supplemental security income. This matter is before the Court for disposition based upon the parties' full consent   (ECF Nos. 3, 4), and for consideration of Plaintiff's Statement of Errors (ECF No. 16), the Commissioner's Memorandum in Opposition (ECF No. 23), and the administrative record (ECF No. 11).   For the reasons that follow, the Court **OVERRULES** Plaintiff's Statement of Errors and **AFFIRMS** the Commissioner's decision.

## I.      BACKGROUND

Plaintiff filed her applications for benefits in July 2011, alleging that she has been disabled since January 13, 2009,[1] due to nerve damage, spinal surgery, nerve damage to left leg, back injury, depression, arthritis, and, obesity.   (R. at 392-99, 400-06, 468.)   Plaintiff's applications were denied initially and upon reconsideration.   Plaintiff sought a *de novo* hearing

---

[1] Plaintiff amended her onset date of disability to April 26, 2011, the date she stopped working. (R. at   20, 43.)

before an administrative law judge. Administrative Law Judge Jon K. Johnson ("ALJ") held three video hearings, the first on September 26, 2013, in which Plaintiff, represented by counsel, appeared and testified, along with Nancy Shapiro, a vocational expert. (R. at 81–112.) The second hearing was held on February 12, 2014, in which Plaintiff, medical experts, Judith Brendemuehl, M.D., Marshall Tessnear, Ph.D., and vocational expert, Nancy Shapiro testified. (R. at 59-80.) The third supplemental video hearing was held on June 18, 2014, in which medical experts, Mary E. Buban, Psy. D., and Judith Brendemuehl, M.D., testified, along with Casey B. Vass, an impartial vocational expert. (R. at 40-56.)

On August 12, 2014, the ALJ issued a decision finding that Plaintiff was not disabled within the meaning of the Social Security Act. (R. at 20-32.) On November 20, 2015, the Appeals Council denied Plaintiff's request for review and adopted the ALJ's decision as the Commissioner's final decision. (R. at 1-7.) Plaintiff then timely commenced the instant action.

## II.    HEARING TESTIMONY

### A.    Plaintiff's Testimony

Plaintiff testified at the September 26, 2013, administrative hearing that she previously worked as a nursing assistant/patient escort for the Veterans Administration in Chillicothe, Ohio. (R. at 87.) She stated that she was fired because of absenteeism, although the VA was aware she was on medical leave. (R. at 89-90.) She testified that she received a letter that either she had to come back to full duty or she was fired. (R. at 90.) Plaintiff testified she was 5' 1" tall and weighed 206 pounds. (R. at 87.)

Regarding her daily activities, Plaintiff said she that was not involved in any social or

church activities. (R. at 88.) She takes over-the-counter medications and prescription Ibuprofen for pain. (*Id.*) Plaintiff testified that she does "some" housework as able. (*Id.*) Her family eats microwave meals. (R. at 89.) Plaintiff was using a cane at the hearing and she testified to using a back brace. (*Id.*) She has a drivers' license. (*Id.*) She smokes "probably a pack" of cigarettes a day. (*Id.*) On a typical day, Plaintiff testified that she watches television, walks through her house, sits on the porch, reads, and plays with her dog. (R. at 90-91.)

Plaintiff originally injured her back at work on February 2, 2010. She returned to work first on light duty, then to regular duty. She was put on leave in April 2011 by Dr. Karr. (R. at 92.) Plaintiff underwent back surgery in March 2012, but reported that her symptoms were about the same following surgery. (R. at 91.) Her doctors have told her that she could not return to the type of work she had been previously engaged in. (R. at 93.) She loses control of her bladder two to three times per week. (*Id.*) Plaintiff rated her pain severity at a level of 7 on a 0-10 visual analog scale. (R. at 93-94.) She has one-to-two days per week when the pain is worse, and on those "bad" days, she is "lucky if [she] can get up and go to the bathroom." (R. at 94.) Plaintiff also testified that she underwent carpal tunnel release surgery in April 2013, but that it did not alleviate symptoms of numbness and lack of grip. (R. at 95.)

## B.     Medical Expert Testimony

At the hearing held on February 12, 2014, Judith Brendemuehl, M.D., testified as the medical expert. (R. at 66-75.) After reviewing the record (R. at 67-70), Dr. Brendemuehl concluded that Plaintiff is able to stand and walk a total of two hours out of an eight-hour day, which would put her at the sedentary exertional level of activity. She further opined that

Plaintiff would not be able to twist and bend repetitively, that she would need to have an opportunity to change position and stretch hourly, and that she could lift less than 25 pounds. (R. at 71-72.)

Dr. Brendemuehl testified that the medical evidence primarily relates to Plaintiff's back pain and obesity.  (R. at 70.)  Dr. Brendemuehl stated that Plaintiff's physical examinations are inconsistent.  By way of example, Dr. Brendemuehl pointed out that on July 23, 2013, Plaintiff's gait and balance were found to be normal yet her straight leg test was positive, which is not consistent with the bulk of the record evidence.  (R. at 69.)

When examined by Plaintiff's counsel, Dr. Brendemuehl explained that although Plaintiff's pre-operative report showed discogenic material was central, surgery does not entirely remove discs, just offending portions.  She further testified that the record reflects Plaintiff improved after her first surgery.  (R. at 73.)  Plaintiff had a second surgery in which the surgeon removed what he thought was residual.  (*Id.*)  Dr. Brendemuehl also explained that pain is variable dependent on success of surgery as pain comes from whatever is being impinged. (*Id.*)  She noted that the record does not contain magnetic resonance imaging (MRI) following Plaintiff's second surgery.  Her treatment notes, however, reflect that Plaintiff continued to experience radicular symptoms, and her seated-leg raise test was positive, but her reflexes were normal.  (R. at 74.)  Dr. Brendemuehl further noted that an evaluation from Riverside Methodist Hospital showed that with light touch to her back, Plaintiff nearly fell out of the chair and fell to the ground if her incision was touched.  Dr. Brendemuehl stated that these are extremely unusual findings and not expected in a normal back examination.  (R. at 75.)

Dr. Brendemuehl also testified at the June 18, 2014 hearing. She testified that, in light of the preoperative report for carpel tunnel release, Plaintiff could perform at the light exertional level with postural limitations. (R. at 46.) Dr. Brendemuehl also testified that she saw no written prescription for a cane or walker after surgery. (R. at 45-46.)

## C. Vocational Expert Testimony

Nancy Shapiro testified as the vocational expert ("VE") at the both the September 26, 2013 and February 12, 2014 hearings. (R. at 76-79, 103-04.) The VE testified that Plaintiff's past relevant work included a nursing assistant, which is a medium-to-heavy exertion, semi-skilled level position. (R. at 103.)

The ALJ proposed a series of hypothetical questions regarding a hypothetical individual with Plaintiff's age, education, work experience. The VE testified that such an individual with the residual functional capacity ("RFC") that the ALJ ultimately assessed could perform over 8,400 sedentary jobs in the regional economy and 1,198,000 sedentary jobs in the national economy including the representative positions of surveillance system monitor, receptionist or an addresser. (R. at 76-77.)

When examined by Plaintiff's counsel, the VE testified that if the hypothetical individual was limited to occasional handling, fingering and feeling with their dominate hand; had to sit every 30 minutes for 5 minutes duration; off task 15% of the time; or absent two or more days per month on a regular basis, she could not maintain employment. (R. at 77-78.)

## III. MEDICAL RECORDS[2]

---

[2] In addition to exertional impairments, the Court recognizes that Plaintiff alleges disability in part because of her mental impairments. Plaintiff's Statement of Errors, however, focuses on Plaintiff's physical impairments and limitations. Accordingly, the Court will focus its review of the medical evidence on Plaintiff's physical impairments and limitations.

A.      **Matthew C. Werthammer, M.D.**

Plaintiff began treating with neurosurgeon Dr. Werthammer on June 10, 2010.   Plaintiff complained of back and left-leg pain, which she alleged was worse with sitting and standing. Plaintiff also reported numbness and tingling in her foot and toes.   (R. at 919.)   On examination, Dr. Werthammer found Plaintiff's strength was 4+/5 in her left-lower extremity, she had diminished sensation in her lateral and plantar aspect of the left foot, diminished left Achilles reflex, markedly positive straight-leg raise test on her left, and mildly antalgic gait. (*Id.*)   After treatment options were presented, Plaintiff wished to proceed with surgery—specifically, a left-sided L/5-S/1 microdiskectomy for treatment of her leg pain.   (R. at 920.)

On June 22, 2010, Plaintiff underwent left-sided L5-S1 lumbar microdiscectomy and foraminotomy for a left L5-S1 herniated nucleus pulposus with radiculopathy.   (R. at 649-50.)

When seen for neurosurgical follow-up, Plaintiff reported that she fell on the 4th of July, "which really set her back as far as her symptoms are concerned."   (R. at 972.)   In September and December 2010, Dr. Werthammer noted that Plaintiff had marked improvement postoperatively, as well as resolution of her preoperative symptoms.   (R. at 915-18.)   In December, Dr. Werthammer opined that Plaintiff could return to work with the restrictions of no lifting over 25 pounds, no repetitive bending/twisting, and no sitting for more than an hour without getting up and stretching.   (R. at 961.)

Dr. Werthammer evaluated Plaintiff on February 16, 2012.   She reported constant back pain with intermittent pain in both legs, more so on the left than the right, as well as tingling in her left leg and foot.   Examination revealed significant paraspinal muscle tenderness to

palpation throughout her thoracolumbar spine, and diffuse pain with limited effort dependent four+ out of five strength in the lower extremities.   Her gait was slow, and straight-leg raising produced back pain, but no leg pain.   Plaintiff told Dr. Werthammer that she had recently seen Dr. Alberico.   Dr. Werthammer believed another surgery would not be beneficial, but that a spinal cord stimulator would be a reasonable option.   Dr. Werthammer "again encouraged nicotine cessation and significant weight loss."   (R. at 913-14.)

**B.      Ohio Valley Physicians/Aaron Karr, D.O.**

Plaintiff began treating at the primary care office of Ohio Valley Physicians in May 2010. (R. at 1166-68.)   On May 21, 2010, an MRI of Plaintiff's lumbar spine revealed a large left paracentral disk protrusion at L5-S1, severely narrowed neuroforamen, tear of annulus fibrosus, and mild broad base disc bulge at L4-5.   (R. at 747.)

Plaintiff first saw Dr. Karr on August 26, 2010, with complaints of burning in her legs and pain in back.   She reported suffering a recent fall and having significant tenderness in her sacral area.   Plaintiff described her pain as sharp, stabbing, and localized to her sacrum. Plaintiff rated her pain severity at a level of 6 on a 0-10 visual analog scale.   (R. at 1151.)   Dr. Karr's treatment notes through August 2011 showed positive examination findings of tenderness to palpitations, positive straight-leg raises, and muscle spasms.   (R. at 984-1146.)   Dr. Karr assessed disc degeneration, herniated lumbar disc, lumbar sprain, and sacroiliitis.   (*Id.*) Plaintiff's treatment included Toradol and Nubbin injections.   (*Id.*)   She was prescribed a variety of medications, including Lortab, Zanaflex, Valium, Doxycycline Hyclate, Meloxicam, Morphine, Fentalyn patches, Percocet, Ultram, Baclofen, Celebrex, Medrol, Vicodin, and Soma. (*Id.*)

7

An MRI of Plaintiff's lumbar spine performed in May 2011 showed degenerative changes at L4/L5, but no additional findings of disc herniation, stenosis, or other abnormalities. (R. at 659.)

On March 23, 2013, Plaintiff was seen for a preoperative physical examination to obtain medical clearance for carpal tunnel release surgery. Her examination findings were normal. (R. at 1596-1601.) On July 23, 2013, when seen by Dr. Kincaid, Plaintiff's gait and balance were found to be normal, but her straight leg test was positive. Plaintiff was administered a Solu-Medrol injection. (R. at 1586.)

Plaintiff continued to treat with the physicians at Ohio Valley Physicians through at least October 2013. (R. at 1549-1882.)

### C.    Pleasant Valley Hospital

Plaintiff presented to the emergency room on March 8, 2011, after feeling her back "go out," noting it "popped" while driving to work. She complained of pain across her low back, and was diagnosed with exacerbation of chronic back pain. (R. at 656-58.)

### D.    John Adesioye, M.D.

On July 19, 2011, Plaintiff consulted with Dr. Adesioye for her low back pain. Plaintiff reported that her pain radiated down into her hips, buttocks, and left leg, to just below her knee, with numbness in her left small toes. Her pain was worse with coughing, bending, twisting, and lifting. She reported that she had previously taken Valium, Vicodin, and Neurontin for the pain and was currently using a TENS unit.

On examination, Dr. Adesioye found that Plaintiff exhibited a reduced range of motion; tenderness in her lower lumbar region, worse on the left; positive straight-leg raise on her left

8

lower extremity at about 45 degrees; and decreased sensation in her lateral calf on her left lower

extremity.   He assessed lumbar radiculitis, failed back surgery syndrome, and lumbar disc

herniation status post-surgery.   (R. at 721-22.)   On July 28, 2011, Plaintiff underwent a lumbar

transforaminal epidural steroid injection.   (R. at 755-57.)

## E.        Riverside Methodist Hospital

On December 18, 2011, Plaintiff presented to the emergency room complaining of left

lower extremity weakness and having fallen twice resulting in decreased sensation from her left

knee down.   (R. at 672.)   Plaintiff's husband reported that she fell to the ground if the incision

site on her back was touched.   (R. at 696.)   Examination in the emergency room revealed four

out of five strength of her left lower extremity, light touch sensation grossly abnormal to her left

lateral foot and leg, decreased sensation to the medial aspect of her left thigh, and slow bilateral

patellar deep tendon reflexes.   (R. at 680-81.)   An MRI of her lumbar spine revealed findings of

left hemilaminectomy at L5-S1 with material in the central to left paracentral zone, which

abutted the thecal sac and the descending left S1 nerve root and demonstrated contrast

enhancement, which likely represented post-surgical scar tissue; mild right and mild-to-moderate

left neural foraminal stenosis; mild thecal sac effacement and mild left lateral recess stenosis

secondary to disc bulge at L4-5; mild bilateral facet arthropathy; and thickening of the

ligamentum flavum.   (R. at 687-88.)   An MRI of Plaintiff's thoracic spine revealed small or

tiny left paracentral disc protrusion at T6-T7 and T7-T8, which partially effaced the left aspect of

the thecal sac.   (R. at 689.)   An MRI of her cervical spine revealed a broad-based osteophyte

complex at C4-5 which effaced the thecal sac; mild-to-moderate bilateral foraminal narrowing at

C4-5; mild discogenic change; and straightening of the cervical lordosis likely related to positioning or muscle spasms.   (R. at 690.)

Neurosurgeon Ward Buster, D.O., was consulted and found that Plaintiff's left lower extremity strength was four out of five throughout, and that her deep-tendon reflexes were three out of four, but symmetric on examination.   (R. at 674.)   Dr. Buster offered further evaluation such as electromyography (EMG), neurology consultation, and epidural, but Plaintiff declined. She was quite concerned in regards to prescriptions for pain medications.   Dr. Buster observed that Plaintiff had full range of motion in all of her extremities.   Dr. Buster also noted that Plaintiff's "exam is unusual in that with light touch to the low back, she nearly fell out of her chair."   (R. at 673.)   Upon discharge, it was noted her examination seemed "largely effort dependent."   (R. at 712.)   Plaintiff was diagnosed with lower extremity weakness and back pain.   (*Id.*)

## F.    **Appalachian Community Hospital and Health Associates**

Following her hospitalization on December 20, 2011, when discussing a home health certified plan of care, it was noted that Plaintiff was not homebound by physician order and could in fact leave home with assistance and had done so to attend medical appointments.   (R. at 806, 1416.)   Plaintiff had a home health certified plan of care for the time period of December 20, 2011 through January 9, 2012.   (R. at 758-59.)   When seen for a physical therapy evaluation on December 28, 2011, the therapist noted Plaintiff exhibited poor balance, decreased step length bilaterally, stiff and slow gait, decreased strength in her left lower extremity, decreased sensation in her left lower extremity, and was also using her walker.   (R. at 1461.) At discharge, Plaintiff reported constant moderate pain, which she described as chronic, intense,

sharp, shooting, and radiating to her left lower leg.   The occupational therapist concluded that Plaintiff did not require skilled occupational therapy services at that time.   The therapist felt Plaintiff would benefit from a toilet riser, shower chair, grab bar, reacher, and sock aide, which she opined would improve Plaintiff's independence as well as her safety with activities of daily living.   (R. at 869.)

## G.    Amanda Hamilton, M.D.

Plaintiff consulted with Dr. Hamilton at the Holzer Clinic on August 24, 2011, for her lower back pain with radiculopathy.   Plaintiff presented with left lower extremity give away weakness, decreased temperature sensation throughout the left side, and an antalgic gait.   Dr. Hamilton found that Plaintiff suffered from chronic, worsening radiculopathy, noting that a recent MRI showed minimal new abnormalities and nothing that requires surgical intervention. Dr. Hamilton "re-referred" Plaintiff to neurosurgery and ordered an EMG of Plaintiff's bilateral lower extremities.   (R. at 736-68.)

Plaintiff saw Dr. Hamilton for follow-up on September 19, 2011.   Plaintiff complained of fatigue, back pain, dizziness, lightheadedness, anxiety, depression, and insomnia.   Her EMG showed that her lower extremities were normal and further showed no peripheral neuropathy, mononeuropathy, or radiculopathy.   (R. at 741.)

When Plaintiff was seen in December 2011, Dr. Hamilton found extensive give away weakness and decreased temperature on her left body.   He noted that Plaintiff used a walker. Dr. Hamilton assessed radiculopathy and fibromyalgia and opined that Plaintiff's alleged pain symptoms were out of proportion to the EMG/MRI findings.   Plaintiff was referred to rheumatology for evaluation.   (R. at 742-44.)

11

**H.** **Holzer Medical Center**

Plaintiff presented to the emergency room on January 24, 2012, after falling, reporting that her right leg gave out from under her after she tried to get up off the couch.   She complained of pain in her right hip, right shoulder, lower back, and right side of her head.   (R. at 879.)   On examination, her cervical spine was found to be tender to touch, with mild-to-moderate cervical paravertebral spasm on the right side of her posterior neck.   (R. at 880.)   An X-ray of Plaintiff's neck revealed moderate narrowing of the intervertebral disc space at C3-4 and C4-5.   (R. at 881.)

Plaintiff was assessed with a history of fall, injury at home/environment, and neck pain.   (R. at 880.)

**I.** **Anthony Alberico, M.D.**

On February 6, 2012, neurosurgeon Dr. Alberico evaluated Plaintiff, who reported that she had severe chronic pain with radiation into her left lower extremity and that sitting/standing aggravated her pain.   On examination, Dr. Alberico found straight leg raising was positive on the left to 20-30 degrees and negative on the right; right knee jerk was trace to 1/4, right ankle jerk was 1-2/4, and left ankle jerk was 1+/4; Plaintiff had four+ out of five weakness of dorsiflexion and plantar flexion weakness on the left; her gait was very antalgic; and she walked with a rolling walker.   He assessed chronic low-back pain with radiation to her left lower extremity, status post left L5-S1 laminotomy and diskectomy, obesity, and narcotic dependence. (R. at 1188.)

Plaintiff returned on February 20, 2012.   Two MRIs demonstrated a disk fragment at L5-S1, which was central and perhaps slightly eccentric to the left.   After reviewing the MRIs

and examining Plaintiff, Dr. Alberico assessed a retained disk or recurrent disk at L5-S1 central and recommended a laminectomy.   (R. at 1186.)   On March 4, 2012, Plaintiff underwent a right L5-S1 hemilaminotomy and diskectomy operative scope for microdissection for herniated nucleus pulposus, L5-1 central.   (R. at 1198-1200.)

**J.      State-Agency Evaluation**

On October 3, 2011, state-agency physician, Teresita Cruz, M.D., reviewed the record and opined that Plaintiff could lift and/or carry twenty-five pounds occasionally and ten pounds frequently; stand and/or walk about two hours in a workday; and sit for about six hours in a workday.   (R. at 134.)   She further concluded that Plaintiff is limited to occasionally climbing ramps/stairs, balancing, stooping, kneeling, crouching, or crawling; but can never climb ladders, ropes, or scaffolds.   (R. at 135.)   Dr. Cruz based Plaintiff's limitations on "significant spinal stenosis, recurrent disc herniation. Deg. disc related changes at L4/L5. Lumbar radiculitis. Failed back surgery syndrome."   (*Id.*)   Dr. Cruz found Plaintiff's allegations partially credible.   She noted that Plaintiff does not have many ongoing conditions related to her spine that would cause her alleged pain and limitations.   (R. at 134.)

On May 8, 2012, state-agency physician Rannie Amiri, M.D., reviewed the record upon reconsideration and prepared two RCF assessments.   The first covered the period until November 30, 2011, and limited Plaintiff to lift and/or carry twenty pounds occasionally and ten pounds frequently; stand and/or walk about six hours in a workday; and sit for about six hours in a workday.   (R. at 170-71.)   Dr. Amiri provided the following explanation for Plaintiff's exertional limitations:

> Morbidly obese clmt (BMI @ 41) with long and complicated history of LBP. Clmt underwent L5-S1 lumbar microdiscectomy and foraminotomy 6/2010 for HNP with radiculopathy with some improvement.  Pain returned however, but

13

> 5/2011 MRI showed unremarkable findings T 12-L4 with [degenerative disc disease at] L4-5. Gait normal during this time period with preserved LE strength and sensation. Carried dx of failed back syndrome. Sept 2011 LE EMG negative.

(R. at 171.) Dr. Amiri also limited Plaintiff to occasionally climbing ramps, stairs, or stooping; frequent balancing; and never climbing ladders, ropes, or scaffolds. Kneeling and crouching were unlimited. (*Id.*) Dr. Amiri also opined that Plaintiff should avoid commercial driving, operating machinery, and unprotected heights. (R. at 172.)

The second RFC assessment Dr. Amiri prepared covered the time period from December 1, 2011 to the present. In this RFC assessment, he limits Plaintiff to lifting and/or carrying twenty pounds occasionally and ten pounds frequently; standing and/or walking about four hours in a workday; sitting for about six hours in a workday; and limited capacity to push/pull in her left lower extremity. (R. at 172-73.) Dr. Amiri also opined that Plaintiff could never crawl. (R. at 173.)

## IV.    THE ADMINISTRATIVE DECISION

On August 12, 2014, the ALJ issued his decision. (R. at 20-32.) The ALJ found that Plaintiff met the insured status requirements of the Social Security Act through December 31, 2015. (R. at 22.) At step one of the sequential evaluation process,[3] the ALJ found that Plaintiff

---

[3] Social Security Regulations require ALJs to resolve a disability claim through a five-step sequential evaluation of the evidence. *See* 20 C.F.R. § 416.920(a)(4). Although a dispositive finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

    1.     Is the claimant engaged in substantial gainful activity?
    2.     Does the claimant suffer from one or more severe impairments?
    3.     Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?
    4.     Considering the claimant's residual functional capacity, can the claimant

14

had not engaged in substantially gainful activity since April 26, 2011, the amended alleged onset date. (R. at 23.) The ALJ found that Plaintiff had the severe impairments of degenerative disc disease, status-post discectomy, borderline intellectual functioning, and major depressive disorder. (*Id.*) The ALJ also found that Plaintiff's hypertension, hyperlipidemia, obesity, respiratory abnormalities, fibromyalgia, sprain on the right knee, and carpal tunnel syndrome are not severe impairments because these conditions were being managed medically and should be amenable to proper control by adherence to recommended medical management and medication compliance and also because they cause no more than minimal vocationally relevant limitations. (R. at 23-24.) He further found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 24.) At step four of the sequential process, the ALJ evaluated Plaintiff's RFC. The ALJ found:

> that [Plaintiff] has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except she could occasionally perform all postural activities but could not twist or bend on a repetitive basis. She would need to stand and stretch on at least an hourly basis. She could perform unskilled entry-level work with no fast pace production or quota requirements.

(R. at 25.) In reaching this determination, the ALJ accorded great weight to Dr. Brendemuehl's medical expert testimony, explaining that she reinforced her opinion with references to specific evidence. The ALJ assigned some weight to Dr. Brendemuehl's testimony at the June 18, 2014,

---

perform his or her past relevant work?
5.    Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. § 416.920(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009); *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

hearing. (R. at 28.) The ALJ also gave great weight to the opinions of Drs. Cruz and Amiri, the state-agency consultant physicians, reasoning that their expert opinions are balanced, objective, and consistent with the evidence of record as a whole. (R. at 30.) The ALJ further noted that although Drs. Cruz and Amiri did not have an opportunity to examine or treat Plaintiff, their reports clearly reflected a thorough review of the record and were supportable. (*Id.*)

The ALJ further noted that Plaintiff's statements concerning the intensity, persistence and limiting effects of her symptoms were not entirely credible. (R. at 26.) He explained that the credibility of Plaintiff's allegations of disabling symptoms and limitations is diminished because those allegations are greater than expected in light of the objective clinical evidence and treatment notes. (R. at 27.)

Relying on the VE's testimony, the ALJ determined that even though Plaintiff is unable to perform her past relevant work, other jobs exist in the national economy that Plaintiff can perform. (R. at 31-32.) He therefore concluded that Plaintiff was not disabled under the Social Security Act. (R. at 32.)

## V.     STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'" *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). Under this standard, "substantial evidence is

16

defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

Although the substantial evidence standard is deferential, it is not trivial.   The Court must "'take into account whatever in the record fairly detracts from [the] weight'" of the Commissioner's decision.   *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)).   Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'"   *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).

Finally, even if the ALJ's decision meets the substantial evidence standard, "'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'"   *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir.   2007)).

## VI.     ANALYSIS

In her Statement of Errors, Plaintiff asserts that: 1) the ALJ erred in failing to perform a proper pain analysis by failing to consider several factors in his determination; 2) the ALJ erred in failing to provide reasons for his credibility analysis; and 3) the ALJ failed to find that Plaintiff's chronic obstructive lung disease was a severe impairment. (ECF No. 16.)

**A.      The ALJ Performed Proper Pain and Credibility Analyses**

The Sixth Circuit has provided the following guidance in considering an ALJ's

assessment of disabling pain:

> First, we examine whether there is objective medical evidence of an underlying
> medical condition.  If there is, we then examine: (1) whether objective medical
> evidence confirms the severity of the alleged pain arising from the condition; or
> (2) whether the objectively established medical condition is of such a severity that
> it can reasonably be expected to produce the alleged disabling pain.

*Felisky v. Bowen*, 35 F.3d 1027, 1038–39 (6th Cir.1994).   The Court has "explicitly noted,

however, this test 'does not require objective evidence of the pain itself.'"   *Id*. at 1039 (quoting

*Duncan v. Sec. of Health and Human Services*, 801 F.2d 847, 853 (6th Cir. 1986)).

Here, there is no dispute that Plaintiff has an underlying medical condition within the

requisite standard of *Felisky*.   Thus, the Court's analysis will proceed directly to the second

prong, which has two parts.

"It is important to note that these two parts are alternatives," and a "checklist of factors"

is used in evaluating symptoms.   *Id*.   Specifically, the list of factors includes: (1) Plaintiff's

daily activities; (2) the location, duration, frequency, and intensity of the pain; (3) precipitating

and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medications

taken to alleviate the pain or other symptoms; (5) treatment, other than medication, received for

relief of the pain; and (6) any measures used to relieve the pain.   *Id*. at 1039-40; *accord* 20

C.F.R. §§ 404.1529(c)(3)(i)-(vii).   "The ALJ need not analyze all seven factors identified in the

regulation but should provide enough assessment to assure a reviewing court that he or she

considered all the relevant evidence."   *Cross v. Comm'r of Soc. Sec.*, 373 F. Supp. 2d 724, 733

(N.D. Ohio 2005). In addition to these factors, the Court will also review the opinions and statements of the plaintiff's doctors. *Id.*

"The ALJ's assessment of credibility is entitled to great weight and deference, since he [or she] had the opportunity to observe the witness's demeanor." *Infantado v. Astrue*, 263 F. App'x 469, 475 (6th Cir. 2008) (citing *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997)); *Sullenger v. Comm'r of Soc. Sec.*, 255 F. App'x 988, 995 (6th Cir. 2007) (declining to disturb the ALJ's credibility determination, stating that: "[w]e will not try the case anew, resolve conflicts in the evidence, or decide questions of credibility" (citation omitted)). This deference extends to an ALJ's credibility determinations "with respect to [a claimant's] subjective complaints of pain." *Allen v. Comm'r of Soc. Sec.*, 561 F.3d 646, 652 (6th Cir. 2009) (quoting *Siterlet v. Sec'y of Health & Hum. Servs.*, 823 F.2d 918, 920 (6th Cir.1987)). Despite this deference, "an ALJ's assessment of a claimant's credibility must be supported by substantial evidence." *Walters*, 127 F.3d at 531. Furthermore, the ALJ's decision on credibility must be "based on a consideration of the entire record." *Rogers*, 486 F.3d at 247 (internal quotation omitted). An ALJ's explanation of his or her credibility decision "must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." *Id.* at 248; *see also Mason v. Comm'r of Soc. Sec. Admin.*, No. 1:06–CV–1566, 2012 WL 669930, at *10 (N.D. Ohio Feb. 29, 2012) ("While the ALJ's credibility findings 'must be sufficiently specific', *Rogers*, 486 F.3d at 248, the intent behind this standard is to ensure meaningful appellate review.").

Here, the ALJ properly provided the requisite assessment to assure the Court that he considered all of the relevant evidence. First, the ALJ found that Plaintiff had only "mild

restriction" in her activities of daily living. (R. at 24.) In making this determination, the ALJ reasoned that although cleaning, cooking, and grocery shopping is performed by friends and family, Plaintiff is able to tend to personal care without any assistance. (R. at 24, 90-92.) The ALJ also considered that Plaintiff spends her days watching television, walking through her house, sitting on the porch, reading and playing with her dog. (*Id*.) The ALJ observed that the Plaintiff's alleged limitations on her daily activities "cannot be objectively verified with any reasonable degree of certainty." (R. at 30.) He explained that "[e]ven if [Plaintiff's] daily activities are truly as limited as alleged, it is difficult to attribute that degree of limitation to the claimant's medical condition, as opposed to other reasons, in view of the relatively weak medical evidence and other factors discussed in [the ALJ's] decision." (*Id*.) The Court concludes that the ALJ reasonably discounted Plaintiff's allegations of disabling pain based upon her activities of daily living. In addition to the activities the ALJ discussed, Plaintiff has a driver's license, and performs "some" housework, as she is able. (R. at 89.)

Second, as to the location, duration, frequency and intensity of the pain, the ALJ performed a proper credibility analysis and determined that Plaintiff's allegations of disabling symptoms and limitations were "greater than expected in light of the objective clinical evidence and treatment notes." (R. at 27.) *See* 20 C.F.R. § 404.1529(c)(2) (objective findings are useful in assessing the intensity and persistence of a claimant's symptoms). Plaintiff elected to undergo surgery in June 2010, after Dr. Werthammer advised her that a microdiskectomy would likely alleviate her leg pain but not her chronic back pain. He advised her that exercise and weight loss as part of her postoperative regimen would "certainly help with her back pain." (R. at 648.) The ALJ noted that, despite a setback from falling down in July 2010, Plaintiff had

20

marked improvement postoperatively. (R. at 27, 915-18.) For example, upon examination, "she had normal gait, straight leg raising was negative and she was given permission to return to work on December 27, 2010, with limitations of lifting no more than 25 pounds, no repetitive bending or twisting, and no sitting more than one hour without getting up and stretching." (R. at 27, 961.) Examinations throughout 2011, including an MRI in May 2011, EMG in September 2011, and another MRI in December 2011, demonstrated that Plaintiff did not require surgical intervention. (R. at 27.) Examinations revealed some limitations in Plaintiff's ability to perform daily activities, with the need for a walker to assist with ambulation but also showed full range of motion in all extremities and the ability to leave home without assistance. (*Id*.) Dr. Werthammer examined Plaintiff again in February 2012, at which time she reported constant back pain with intermittent pain into both legs with tingling in the left leg and foot. An MRI, however, "did not support additional surgery but a spinal cord stimulator was a possibility." (R. at 27, 913-14.) Plaintiff was specifically advised that there was only a 50/50 chance she would have significant improvement from surgery. (R. at 27.)

Despite being advised against repeat surgery by treating physicians, Plaintiff underwent laminotomy and discectomy in March 2012. (R. at 27-28, 913-14.) The ALJ noted that medical examinations between March 2012 and December 2012 following the second surgery reflected that Plaintiff's "gait, stance, balance, and reflexes were overall normal." (R. at 28, 1586.) "Furthermore, consistently, throughout 2013, examinations . . . noted complaints of back pain, but gait and stance were normal and back examination was normal." (R. at 28, 1549-1882.)

In addition to the above-detailed examination of Plaintiff's medical record, the ALJ gave

21

great weight to Dr. Brendemuehl's testimony at the February 2014 hearing and some weight to her testimony at the June 2014 hearing.   In February 2014, Dr. Brendemuehl testified that Plaintiff is able to stand and walk a total of two hours our of an eight-hour day, which translates to the sedentary exertional level.   (R. at 71-72.)   She also testified that Plaintiff's physical examinations are inconsistent, with gait and balance found to be normal and the positive straight leg test and evaluation from Riverside Methodist Hospital in which Plaintiff nearly fell out of her chair from a light touch to the back being inconsistent with the bulk of the evidence in the record and abnormal, respectively.   (R. at 69, 75.)   In June 2014, she testified that Plaintiff could perform light exertional activity with some postural limitations.   (R. at 46.)   Thus, the ALJ's explanation of his determination that "the record includes evidence strongly suggesting that [Plaintiff] has exaggerated symptoms and limitations" was sufficiently specific and did not constitute reversible error.   *See Rogers*, 486 F.3d at 247 (credibility determination must be based on entire record and sufficiently specific); *Walters*, 127 F.3d at 531 ("Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among the medical reports, claimant's testimony, and other evidence.").

Third, the ALJ examined precipitating and aggravating factors, such as Plaintiff's reported fall in January 2012 (R. at 27), as well as her mental health (R. at 29.)   The ALJ concluded that the aggravating factors did not weigh in favor of finding Plaintiff's pain allegations to be credible.   Fourth, the ALJ noted that the medical records "discuss weaning from opiods and indicate use is less.   In fact, [Plaintiff] testified that she is currently using over-the-counter medications and prescription ibuprofen for pain."   (R. at 29.)   Finally, the ALJ also noted other types of treatment or restrictive instructions given to Plaintiff over the course of

22

her medical care, for example, the use of a walker after her first surgery. (R. at 27.)

Thus, in evaluating Plaintiff's subjective complaints, the ALJ properly applied the requisite factors and found "contradictions among the medical reports, claimant's testimony, and other evidence." *Walters*, 127 F.3d at 531. The ALJ's assessment of credibility, therefore, is entitled to "great weight and deference." *Infantado*, 263 F. App'x at 475. Accordingly, the Court finds that the ALJ offered good reasons for finding the Plaintiff not entirely credible and that substantial evidence supports those reasons.

**B.     The ALJ Properly Identified Plaintiff's Severe Impairments**

In her final contention of error, Plaintiff maintains that the ALJ should have found her chronic obstructive pulmonary disease (COPD) to be a severe impairment. The Commissioner, on the other hand, maintains that Plaintiff failed to provide evidence that her COPD is severe.

At step two of the sequential evaluation process, the Commissioner must consider whether a claimant has a severe impairment. 20 C.F.R. § 416.920(a)(4). "To surmount the step two hurdle, the applicant bears the ultimate burden of establishing that the administrative record contains objective medical evidence suggesting that the applicant was 'disabled,' as defined by the Act . . . ." *Despins v. Comm'r of Soc. Sec.*, 257 F. App'x 923, 929 (6th Cir. 2007). The Regulations generally define severe impairment as "any impairment or combination of impairments which significantly limits your physical or mental ability to do basic work activities." 20 C.F.R. § 416.921(b).

The United States Court of Appeals for the Sixth Circuit has generally described step two of the evaluation process as "a *de minimus* hurdle." *Simpson v. Comm'r of Soc. Sec.*, 344 F. App'x 181, 190 (6th Cir. 2009) (internal quotations omitted). Accordingly, "an impairment can

23

be considered not severe only if it is a slight abnormality that minimally affects work ability regardless of age, education, and experience." *Id.* (internal quotations omitted). The mere existence of impairments, however, does not establish significant limitation in "performing basic work activities for a continuous period of time." *Despins*, 257 F. App'x at 930. Furthermore, in considering whether a claimant has a severe impairment, an ALJ need not accept unsupported medical opinions or a claimant's subjective complaints. *McDaniels v. Astrue*, No. 1:10–CV–699, 2011 WL 5913973, at *4 (S.D. Ohio Nov. 28, 2011).

In this case, the Court finds that substantial evidence supports the ALJ's severe impairment finding. The ALJ found that Plaintiff's "respiratory status remained stable overall." (R. at 23.) The record evidence is consistent with such a conclusion. Although Plaintiff was diagnosed with COPD in August 2013 with dyspnea, coughing, and wheezing, she did not have chest pain, discomfort, palpitations, abnormal heart rate, or hemoptysis. (R. at 1578.) As the ALJ further noted, the medical record reflects that Plaintiff's pulmonary examinations revealed stable respiratory status overall. (R. at 23, 688, 770, 1784-1786.) Moreover, the record reflects that Plaintiff was encouraged to quit smoking but continued to smoke up to two packs of cigarettes per day. (R. at 710, 1604, 1610, 1828, 1835.) Finally, as detailed above, substantial evidence supports the ALJ's finding that Plaintiff's subjective complaints were not entirely credible. This, combined with the fact that none of Plaintiff's treating or examining physicians issued opinions limiting her work abilities based on COPD, constitutes substantial evidence in support of the ALJ's determination that Plaintiff's COPD was not severe.

## VII. DISPOSITION

In sum, from a review of the record as a whole, the Court concludes that substantial

evidence supports the ALJ's decision denying benefits.    Accordingly, Plaintiff's Statement of

Errors is **OVERRULED** and the Commissioner of Social Security's decision is **AFFIRMED**.


Date: March 31, 2017                                        _____/s/ *Elizabeth A. Preston Deavers*____
                                                           ELIZABETH A. PRESTON DEAVERS
                                                           UNITED STATES MAGISTRATE JUDGE